**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TARGETSMART HOLDINGS, LLC, and | : |
| TARGETSMART COMMUNICATIONS, LLC | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : C.A. No. 1:18-cv-11365-DPW |
| | : |
| GHP ADVISORS, LLC, d/b/a GOOD HARBOR | : |
| PARTNERS, and CATALIST LLC, | : |
| | : |
| Defendants. | : |

## SECOND AMENDED COMPLAINT

Plaintiffs TargetSmart Holdings, LLC and TargetSmart Communications, LLC

(collectively, "TargetSmart"), by and through their undersigned counsel, file this Complaint

against Defendants GHP Advisors, LLC, d/b/a Good Harbor Partners ("GHP") and Catalist LLC

("Catalist") seeking damages and permanent injunctive relief for misappropriation of trade

secrets, breach of contract, and other related claims.

## Introductory Statement

In late 2017, GHP, a Boston-based investment firm, approached TargetSmart claiming to

represent donors and/or funders interested in combining innovative and successful companies in

the Democratic/progressive market, like TargetSmart, with the goal of winning more elections.

As part of a due-diligence process, TargetSmart entered into a Mutual Non-Disclosure

Agreement ("Mutual NDA") and thereafter shared with GHP a range of confidential, proprietary

TargetSmart information, including intellectual property and trade secrets.  It was later

discovered that GHP was not in-fact representing a donor or funder, but was working as an agent

for a TargetSmart competitor, Catalist. In violation of the NDA, GHP shared confidential information with Catalist who in-turn shared it with third other parties.  GHP and Catalist devised and executed a scheme to induce TargetSmart to disclose confidential and proprietary information and misuse that Information to damage and/or unlawfully compete with TargetSmart.

To date, GHP and Catalist have failed and/or refused to comply with TargetSmart's demands concerning TargetSmart's confidential and proprietary information, including that GHP and Catalist return the information, identify parties or individuals to whom the existence of a potential transaction had been shared, and more.  In further support of its claims, TargetSmart alleges as follows:

### The Parties

1.      TargetSmart Holdings, LLC is a Delaware limited liability company with a principal place of business located at 1155 15th Street NW, Suite 750, Washington, DC 20005.

2.      TargetSmart Communications, LLC is a Delaware limited liability company with a principal place of business located at 1155 15th Street NW, Suite 750, Washington, DC 20005. TargetSmart Communications, LLC is a wholly-owned subsidiary of TargetSmart Holdings, LLC.

3.      GHP is a Massachusetts limited liability company with a principal place of business located at 281 Summer Street, 2nd Floor, Boston, MA 02210.

4.      Catalist is a Delaware limited liability company with a principal place of business located at 1090 Vermont Avenue NW, Suite 300, Washington, DC.

## Jurisdiction and Venue

5.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, because the Complaint asserts a claim which arises under the laws of the United States, specifically a claim for violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836.

6.      GHP is subject to general and specific jurisdiction in Massachusetts as GHP's principal place of business is located within this Judicial District in Boston, Massachusetts.

7.      Catalist is subject to personal jurisdiction in Massachusetts because it transacts business in Massachusetts, has caused tortious injury in Massachusetts, and, on information and belief, has derived substantial revenue from business conducted in Massachusetts.

8.      Catalist has purposefully availed itself of the rights, benefits, and privileges of doing business in Massachusetts.

9.      Catalist is subject to personal jurisdiction in Massachusetts because it hired GHP to be its agent and GHP's Massachusetts contacts are imputed to Catalist.

10.     Venue is proper in this Judicial District under 28 U.S.C. § 1391 because at least one Defendant resides in this District and a substantial part of the events giving rise to the claims against all Defendants occurred in this District.  The claims arise out of events occurring in Boston, Massachusetts, and actions taken by each of the Defendants in Boston, Massachusetts, including but not limited to Catalist's engagement of GHP in Massachusetts.

## Factual Allegations

*TargetSmart Is An Innovator In Developing Campaign Data Solutions And Products*

11.     TargetSmart is an industry-leading data, technology, and consulting firm that provides custom, data-driven solutions that help campaigns, candidates, organizations, and companies achieve their goals.  Through its proprietary data solutions, software products, and

data-related professional services, TargetSmart enables campaigns and organizations to communicate with large audiences, personalize outreach, and create lasting relationships.

12.     TargetSmart's unique products include the market's leading national voter file, VoterBase.  TargetSmart has built VoterBase by sourcing data through exclusive partnerships with political, data, and technology providers and then using proprietary processes to maintain accurate voter data and enhance that data to provide superior results to its clients.  TargetSmart has written extensive, proprietary digital code over the past 12 years to create, refine, and improve the quality of VoterBase to meet its customers' needs.  VoterBase is also a key component of another proprietary TargetSmart product, VoterFile 2.0, a multi-channel marketing platform which allows its clients to leverage political data in VoterBase to reach voters with an integrated digital advertising campaign.  VoterFile 2.0 allows clients to collaborate across multiple mediums because it consolidates online, offline and addressable television advertising platforms.

*Catalist Approaches GHP Under the Guise of Acquiring TargetSmart*

13.     On or about November 2, 2017, Catalist and GHP signed a Letter Agreement (the "Letter Agreement").  The Letter Agreement between GHP and Catalist expresses that the reason for Catalist's engagement of GHP was to "serve as advisor to [Catalist] in connection with the potential acquisition of a specific, pre-identified, target company."

14.     The "specific, pre-identified, target company" referred to in the Letter Agreement was TargetSmart.

15.     The Letter Agreement provided that it would be "governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Massachusetts, without regard or reference to conflict of laws principles."

16.     Catalist agreed in the Letter Agreement that its relationship with GHP would be governed by Massachusetts law.

17.     The Letter Agreement empowered GHP to, among other things, "engage with [TargetSmart]" "Manage [the] due diligence process," and "direct [the] transaction process from negotiating the letter of intent to definitive agreements and closing."

18.     On information and belief, Catalist used its engagement with GHP to acquire TargetSmart's trade secrets and confidential business information and to defame TargetSmart in the marketplace.

19.     The Letter Agreement provides that "GHP shall keep [Catalist] informed of the activities undertaken by GHP hereunder and all performances of Services required of GHP hereunder." On information and belief, GHP fully complied with this provision of the Letter Agreement.

20.     On information and belief, Catalist was aware of all the actions taken by GHP alleged in this Complaint. On information and belief, with respect to all the actions taken by GHP as alleged in this Complaint, Catalist either (a) directed GHP's actions, (b) ratified GHP's actions, or (c) retained a right to control GHP's actions such that GHP was not free to conduct the work entirely its own way. Catalist is therefore vicariously liable for any unlawful act or omission alleged in this Complaint.


*GHP Contacts TargetSmart Concerning A Potential Transaction*

21.     On December 5, 2017, Andrew (Drew) Brighton of TargetSmart received an unsolicited email from Mr. Edward Mallin, the former President of another industry data supplier, InfoGroup, regarding a potential new "business opportunity."

22. When Mr. Brighton and Mr. Mallin spoke, Mr. Mallin said that he would like to introduce Mr. Brighton to GHP.

23. On December 7, 2017, Mr. Mallin sent an introductory email to Mr. Brighton and Mr. Mark Miller of GHP.

24. On December 13, 2017, Mr. Miller and Torsten Geers of GHP participated in a call with Mr. Brighton and Jeffrey Ferguson of TargetSmart. During that call, Mr. Miller and Mr. Geers said that GHP had been retained by a number of wealthy individual political funders and/or donors who wanted to improve the data infrastructure in the Democratic and progressive markets, and wanted to combine TargetSmart with other companies in the same market to further these objectives. Mr. Miller and Mr. Geers further represented to Mr. Brighton and Mr. Ferguson that their clients were only interested in winning more elections, were "self-funded," and that money was only a secondary concern.

25. GHP had not been retained by a number of wealthy individual political funders and/or donors but had actually been retained by Catalist.

26. GHP, either individually and with the intention to serve Catalist's interest or in direct concert with Catalist, developed the false narrative that its clients were a number of wealthy individual political funders and/or donors.

*TargetSmart and GHP Enter Into A Mutual Non-Disclosure Agreement*

27. As a result of the December 13, 2017 conversation, on or about December 14, 2017, TargetSmart and GHP entered into a Mutual Nondisclosure Agreement ("Mutual NDA").

28. The Mutual NDA provides that the parties would furnish one another with certain information "which is non-public, confidential, or proprietary in nature" ("Information"). The Mutual NDA encompasses TargetSmart and GHP's entire and exclusive agreement concerning how the parties must handle one another's confidential and proprietary Information.

29.     Under the Mutual NDA, TargetSmart and GHP agreed that neither party would use or disclose Information to anyone "other than its Representatives" without the disclosing party's prior written consent.  The Mutual NDA defines "Representatives" as a party's "employees, agents, advisors or representatives" *only.*

30.     The Mutual NDA further provides that "each party agrees not to, and will direct its Representatives not to, disclose to any third party (a) the existence or contents of this Agreement or (b) the fact that it is evaluating the Information or the possibility of a transaction with the other party."

*TargetSmart Engages In GHP's Due Diligence Process And Provides Confidential And Proprietary Information As Defined In The Mutual NDA*

31.     After the Mutual NDA was in place, GHP provided TargetSmart with a list of requested Information.  GHP and TargetSmart then scheduled an in-person meeting in Boston for December 21, 2017.  On information and belief, Catalist either (a) directed GHP to take this action or (b) ratified GHP's conduct after being informed of the conduct.

32.     In preparation for the meeting, on December 20, 2017, TargetSmart sent GHP a Confidential Information Memorandum ("CIM"), which included confidential and proprietary TargetSmart data; confidential and proprietary Information about TargetSmart's products, services, platforms, and software, including VoterBase and VoterFile 2.0; confidential and proprietary Information about TargetSmart's clients; confidential and proprietary Information about TargetSmart's projected growth opportunities, and other confidential and proprietary financial and other data.  The CIM specifically stated that it constituted "Information" under the Mutual NDA and that the "information contained herein shall not be made available to any third party without prior written consent of TargetSmart."

33.     On December 21, 2017, Mr. Brighton and Mr. Ferguson of TargetSmart met with Mr. Miller and Mr. Geers of GHP at GHP's offices in Boston.  During this meeting, Mr. Miller and Mr. Geers again stated that GHP represented "very, very wealthy individuals who want to acquire established businesses in the Progressive and Democratic market and put them together in order to win more elections.  Money is secondary and they are self-funding."  Mr. Miller and Mr. Geers did not otherwise identify who their clients were at any point during the meeting. When TargetSmart asked them to provide the names of the funders, Mr. Miller and Mr. Geers declined to do so until later in the process.

34.     Mr. Miller and Mr. Geers then proceeded to question Mr. Brighton and Mr. Ferguson extensively about TargetSmart's proprietary voter file products and TargetSmart's customers, as well as TargetSmart's non-voter file business.

35.     At the very end of the meeting, Mr. Miller and Mr. Geers stated that their clients were most interested in buying TargetSmart and combining it with its competitor, Catalist.  This was the first time that GHP mentioned Catalist to TargetSmart during the process.  TargetSmart made it clear that it was only interested in proceeding if the funders and/or donors made the acquisition of both companies, TargetSmart remained in control, and the Catalist leadership team was not part of any combined entity.

36.     On December 27, 2017, Mr. Geers informed Mr. Brighton and Mr. Ferguson that GHP was encouraged by the meeting and would like to proceed with due diligence for a potential transaction.  Mr. Geers subsequently submitted a list of extensive questions that specifically asked about TargetSmart's confidential and proprietary processes and supplier information ("Information Request").  The Information Request sought:

a. TargetSmart's entire book of business separated in two categories, political business (as defined below) and other, and sorted by customers, type of product/service, term of contract (start date, end date, renewal terms), total contract value, annual revenues;

b. A list of all of TargetSmart's third-party relationships in conjunction with creating, maintaining and enhancing its proprietary political databases (VoterBase, ContributorBase, and ElectionBase);

c. A list of all other vendor agreements as well as strategic relationships and a summary of terms relevant for the business;

d. A list of all costs and expenses, including personnel and other items that TargetSmart would reasonably expect to stay with the non-voter file side of the business;

e. A list of items that would require TargetSmart to license-back for continuation of its non-voter file side of the business.

37.     During a conference call on January 3, 2018, TargetSmart advised GHP that it was uncomfortable with the Information Request.  TargetSmart believed that GHP's request went beyond what was required to appraise TargetSmart's business for purposes of a transaction and unnecessarily sought detailed confidential and proprietary information.  Mr. Miller and Mr. Geers responded to TargetSmart's concerns by stating that their clients were only interested in what GHP described as TargetSmart's "political business," despite that the Information Request also sought information about TargetSmart's other business.

38.     TargetSmart's representative, Mr. Amir Akhaven of The Jordan, Edmiston Group, Inc. asked if GHP could instead propose a purchasing price for TargetSmart plus or minus 10%,

if, in exchange, TargetSmart provided GHP with pro forma financials of its "political business" as defined by GHP, despite that TargetSmart disagreed with this characterization because GHP sought information beyond the voter-file business. Mr. Miller and Mr. Geers agreed to this proposal, subject to further due diligence.

39.     Based upon all of GHP's representations and pursuant to the terms of the Mutual NDA, TargetSmart agreed to and did provide further Information to GHP, including pro forma financials based on GHP's characterization of the scope of TargetSmart's "political business."

40.     On or about January 22, 2018, Mr. Akhaven told Messrs. Brighton and Ferguson that GHP had told him that TargetSmart was "bigger than expected," and that it was going to take GHP some time to raise money to acquire TargetSmart.

*TargetSmart Learns From Multiple Sources That Information*
*About the Potential Transaction Has Leaked*

41.     On February 8, 2018, TargetSmart learned that an individual who was not known to TargetSmart was contacting TargetSmart's employees and clients and asking a number of pointed questions about TargetSmart and its relationship with certain specified clients. Some of the questions were based upon non-public Information provided to GHP and covered by the Mutual NDA. TargetSmart researched this individual and learned that he was a writer who had ties to Laura Quinn, the CEO of Catalist.

42.     Catalist is a for-profit entity.

43.     Catalist misrepresents itself to the market as a nonprofit entity when marketing to the political market.

44.     Mr. Ferguson contacted Mr. Miller and Mr. Geers and asked if the writer's inquiries were part of GHP's due diligence process or if the writer was acting on behalf of

Catalist. They responded that the inquiries were not part of the due diligence process, and stated that they would be "shocked" if Catalist was behind the writer's inquiries.

45. Shortly thereafter, TargetSmart CEO, Tom Bonier, contacted Catalist board member Mike Podhorzer and explained the writer's inappropriate conduct. Mr. Bonier further expressed his concern that Ms. Quinn was involved in the writer's conduct. Mr. Podhorzer stated that he would speak to Ms. Quinn. After speaking with her, Mr. Podhorzer called Mr. Bonier and further stated that he did not agree with Ms. Quinn's actions, and promised that the inquiries would stop. At no point during this conversation did Mr. Bonier and Mr. Podhorzer discuss the potential transaction with GHP's clients. That evening, the writer stopped communicating with TargetSmart staff and clients, including unfollowing them on Twitter.

46. On February 21, 2018, a TargetSmart client reported to a TargetSmart employee that a third-party source had told him Catalist was in the process of buying TargetSmart. The client expressed concern over the purported transaction because it recently had chosen TargetSmart's services over Catalist's.

47. TargetSmart reported to Mr. Miller and Mr. Geers that same day by email that news of the parties' proposed transaction had leaked and expressed concern that the Mutual NDA was not being followed. To the dismay of TargetSmart, who had no idea that GHP had shared TargetSmart's information, Mr. Miller and Mr. Geers each responded that they would "reinforce the confidentiality with their clients." Notably, none of GHP's clients should have had any Information or even knowledge about a potential transaction.

48. Mr. Geers also forwarded Mr. Miller's February 21 email to Mr. Steitz and Ms. Quinn, warning them "it is very important that we keep the nature of our discussions with TS

[TargetSmart] confidential" and suggesting the use of a "code name" for TargetSmart to conceal the nature of their further conversations about TargetSmart

*GHP Reveals Its Client In The Proposed Transaction*
*And Its Intentional Breach Of The Mutual NDA*

49.     On March 13, 2018, Mr. Miller asked TargetSmart to participate in a meeting to discuss GHP's findings.  By this point, TargetSmart had learned through Mr. Akhaven that the transaction would not go forward because GHP could not raise the funds to acquire TargetSmart.

50.     On March 14, 2018, a meeting took place at the AFL-CIO offices in Washington, DC and was hosted by Mr. Podhorzer, the AFL-CIO Political Director and Catalist Board member.  Participants in the meeting included Tom Bonier, Drew Brighton, Jeff Ferguson (by phone), Amir Akhaven (by phone) on behalf of TargetSmart, and Torsten Geers, Catalist Board Members Mark Steitz and Mike Podhorzer, and Mark Miller (by phone).

51.     At the beginning of the March 14, 2018 meeting, Mr. Brighton asked about the NDA.  Mr. Podhorzer stated that he was not "under NDA" and he asked if TargetSmart wanted him to step out of the room, adding, "if you feel it's necessary."

52.     To TargetSmart's surprise, GHP revealed for the first time at the March 14, 2018 meeting that its "client" was not a group of individual wealthy funders and/or donors interested in acquiring and combining TargetSmart and Catalist, as GHP had falsely represented to TargetSmart.  In fact, GHP's client *was* Catalist – TargetSmart's chief competitor.

53.     Mr. Geers explained to the TargetSmart representatives at the March 14, 2018 meeting that GHP could not raise enough money for the acquisition because of TargetSmart's size.  Mr. Steitz effusively thanked TargetSmart for participating in "the process," and reinforced how "respectful" Catalist was of the NDA.  Immediately after this assurance, however, Mr.

Steitz admitted that one of Catalist's funders "broke the NDA," and offered, "but what are you going to do?"

54.     As evidenced by Mr. Steitz's and Mr. Podhorzer's presence and statements made at the meeting, GHP had not "respected" the mutual NDA at all.  Quite the contrary, their statements revealed that GHP had, at the very least, made two Catalist representatives aware of the Mutual NDA and a proposed transaction with TargetSmart.

55.     TargetSmart immediately asked who else at Catalist had received TargetSmart's confidential information.  In response, TargetSmart was informed that Mr. Steitz had received all of TargetSmart's confidential Information that was disclosed to GHP and that Ms. Quinn had received some of the information.

56.     Mr. Steitz was not a Representative of GHP and, therefore, was not authorized under the Mutual NDA to receive TargetSmart's confidential Information.  Moreover, GHP had never notified TargetSmart in writing that it was sharing TargetSmart's confidential Information with its competitor, Catalist.

57.     GHP agreed in the Mutual NDA that it would not use or disclose TargetSmart's Information (as defined by the Mutual NDA).  GHP further specifically agreed that it would not disclose to any third party the "possibility of a transaction" with TargetSmart or even the existence of the Mutual NDA.  GHP further specifically agreed that the breach of any provision of the Mutual NDA would cause irreparable injury to TargetSmart and that, in the event of such breach, TargetSmart would be entitled to equitable relief, including an injunction.

58.     Notwithstanding GHP's agreement and its legal duties to TargetSmart, GHP engaged in the following conduct: (1) failed to disclose that GHP was acting as an agent of Catalist in a potential transaction and misrepresented that GHP was representing individual

funders and/or donors; (2) revealed the existence of the Mutual NDA as well as a potential transaction to Catalyst representatives, who were not parties to the Mutual NDA; (3) provided TargetSmart Information to at least one undisclosed "funder."  These actions directly resulted in confidential Information covered in the Mutual NDA being revealed to TargetSmart's clients and potential clients.

59.     On April 10, 2018, TargetSmart sent GHP a letter notifying GHP that it had violated the Mutual NDA and demanding certain action from GHP in accordance with the Mutual NDA and applicable law.  Specifically, TargetSmart demanded that GHP:

 a. immediately return to TargetSmart any and all Information provided to GHP under the Mutual NDA, including computer disks, hard drives, "thumb" drives, portable devices, electronic data and files, and all other copies, reproductions, or notes thereof, and certify that GHP had not retained any Information;

 b. immediately cease and desist disclosing TargetSmart Information to third parties, and, to the extent it had already done so, identify all persons and entities to whom/which GHP had already disclosed such information and identify the specific information disclosed, and inquire from those parties the names with whom they had shared TargetSmart's Information;

 c. identify all funders and/or donors and entities with whom the existence of a potential transaction with TargetSmart was discussed;

 d. inform TargetSmart in writing of its intention to (i) immediately return any and all TargetSmart documents and information in GHP's possession, custody, or control, (ii) make available the computer system to which GHP downloaded or saved TargetSmart Information; (iii) identify to whom TargetSmart's Information,

including the existence of an NDA and the potential for a transaction, had been

disclosed and what Information had been disclosed; and (iv) strictly refrain at all

times in the future from disclosing TargetSmart Information to any other person

or third parties.

60.     GHP responded to TargetSmart's demands through counsel in a letter dated April

13, 2018.  Incredibly, in the letter, GHP simultaneously denied it had breached the Mutual NDA,

but admitted it had shared the potential for a transaction with two contacts at Catalist, Mark

Steitz and Laura Quinn.  GHP further confirmed that it had disclosed other confidential and

proprietary Information to Mr. Steitz.

61.     GHP also attached to its response letter documentation purporting to show that

Catalist was "under NDA" with TargetSmart.  The supposed agreements so blatantly

misrepresent their true nature that Catalist knew or should have known that TargetSmart did not

request that Catalist or any of its representatives sign an NDA with TargetSmart.  GHP's own

documentation shows that GHP altered the Mutual NDA document signed by TargetSmart by

replacing GHP's signature line with a signature line for each Catalist representative, but retaining

a signature line from TargetSmart's Jeffrey Ferguson.  Of course Catalist never received

countersigned copies of the false NDAs (or any true NDAs) signed by a TargetSmart

representative because TargetSmart was not in fact involved in the creation of the false NDAs

and was unaware of their creation until receiving the letter from GHP.

62.     GHP contended in the response letter that Mr. Steitz and Ms. Quinn were "under

NDA" when they received confidential Information.  GHP, however, never provided the

manipulated NDA documents to TargetSmart, and TargetSmart never signed them.  GHP is

therefore aware that Mr. Steitz and Ms. Quinn were never "under NDA" with TargetSmart

because no party ever countersigned the document on TargetSmart's behalf, nor could it have, as TargetSmart was totally unaware of any non-disclosure agreement prepared for its signature without its authorization.

63.     Moreover, instead of identifying the specific Information shared with Catalist and returning the Information to TargetSmart as the Mutual NDA requires, GHP represented in the letter that it had destroyed all of the Information and instructed Catalist to do the same.

64.     GHP failed and/or refused to comply with TargetSmart's demands in its April 10, 2018 letter.  Specifically, it failed to (i) return TargetSmart's Information upon its request; (ii) identify all unauthorized individuals with whom the Information may have been shared; (iii) identify what specific Information was shared with unauthorized parties or individuals; (iv) identify parties or individuals with whom the existence of a potential transaction had been shared; (v) make its computer system available for inspection so that TargetSmart could confirm that none of its confidential Information was retained so that it could not be further misused.

65.     Also on April 13, 2018, TargetSmart sent a letter to Mr. Steitz and Ms. Quinn of Catalist.  The letter informed Catalist that TargetSmart had learned GHP breached the Mutual NDA and that Mr. Podhorzer and Mr. Steitz had received TargetSmart's confidential Information.  The letter further informed Catalist that TargetSmart had reason to believe Catalist was unlawfully using TargetSmart's confidential Information to compete with TargetSmart.  The letter further informed Catalist that TargetSmart had reason to believe that Catalist had shared TargetSmart's proprietary Information with a writer who was making untruthful and disparaging statements about TargetSmart and damaging TargetSmart's relationship with key customers.

66.     TargetSmart demanded in its letter that Catalist deliver to TargetSmart:

a. A written list of TargetSmart's documents, materials, and data in Catalist's possession;

b. All originals and copies of TargetSmart documents, materials, and data;

c. A written certification that Catalist had returned all originals and copies of TargetSmart documents, materials, and data;

d. A written certification that Catalist had ceased and desisted from using any and all of TargetSmart's confidential and proprietary information;

e. The identity of all persons and/or entities to whom TargetSmart's business information, documents, materials, and data had been disclosed, with a description of what was disclosed;

f. All communications with GHP related to TargetSmart.

67. Catalist responded in writing to TargetSmart's letter on April 19, 2018. Catalist certified in its response letter that Ms. Quinn had received TargetSmart's confidential and proprietary Information.

68. Catalist further certified that Mr. Steitz had received confidential and proprietary Information in his role as "liaison" with "Catalist Investors" and "Representatives" of TargetSmart. Catalist contended that "[t]he confidential materials that Mr. Steitz received consisted only of TargetSmart's CIM and some spreadsheets based on data from it." While Catalist represented that Mr. Steitz had not distributed or shared any confidential or proprietary Information, it did not make the same representation about Ms. Quinn.

69. Like GHP, rather than identifying all confidential Information received and who received it, Catalist simply confirmed that it already had destroyed all TargetSmart materials.

70.     Upon information and belief, GHP and Catalist destroyed the Information in an effort to deny TargetSmart any opportunity to discover what Information GHP and/or Catalist had shared and with whom it had shared that information.

71.     Catalist failed and/or refused to comply with TargetSmart's demands concerning TargetSmart's confidential and proprietary Information, including failing to (i) return TargetSmart's Information upon its request; (ii) identify all unauthorized individuals with whom the Information may have been shared, including but not limited to "Catalist Investors" and alleged "Representatives" of TargetSmart; (iii) identify what specific Information was shared with unauthorized parties or individuals; (iv) identify parties or individuals with whom the existence of a potential transaction had been shared; (v) disclose its communications with GHP concerning TargetSmart.

72.     On information and belief, GHP and Catalist devised and executed a scheme to induce TargetSmart to disclose confidential and proprietary Information and misuse that Information to damage and/or unlawfully compete with TargetSmart.

73.     GHP, as agent for Catalist, fraudulently induced TargetSmart to provide its confidential Information to GHP so that GHP could then share this information with Catalist. GHP shared TargetSmart's confidential and proprietary Information with Catalist, in violation of the Mutual NDA.  Catalist then unlawfully disclosed this Information to other third parties, including but not limited to a writer for purposes of making false and disparaging statements to TargetSmart's clients and to third-party news outlets.

74.     On May 10, 2018, TargetSmart's counsel wrote to Catalist's counsel and said "It appears that GHP, as agent for Catalist, fraudulently induced TargetSmart to provide its confidential information to GHP so that GHP could then share this information with Catalist."

Catalist's counsel responded to this specific allegation in a May 25 2018 letter by saying "Catalist has no comment."

*Catalist's Campaign To Defame TargetSmart*

75. On information and belief, Catalist executives falsely told TargetSmart's customers and other third parties that TargetSmart was "for sale," suggesting that TargetSmart's actual and potential clients should not enter into long-term contracts with TargetSmart.

76. As a result of significant client concern regarding TargetSmart being for sale or otherwise going out of business, TargetSmart was forced to take defensive action to reassure its clients and potential clients that it was not for sale and that it would continue to deliver high quality voter data in the future.

77. As one example, TargetSmart had to hire two public relations firms to counter the damage caused to TargetSmart's reputation and goodwill.

78. Catalist also sought to harm TargetSmart by disclosing information about the potential transaction to TargetSmart's clients, potential clients, and vendors, in violation of the Mutual NDA.

79. Rather than returning TargetSmart's documents and materials containing confidential and proprietary information immediately upon its written request, GHP and Catalist deleted and/or destroyed the documents and materials to prevent TargetSmart from discovering the extent of their unlawful activity, in violation of GHP's obligations under the Mutual NDA and both parties duty to preserve evidence of a potential claim against them.

80. Upon information and belief, Catalist continues to misuse TargetSmart's confidential Information, including but not limited to information about its products, including VoterBase and VoterFile 2.0, TargetSmart's client list, and the fact of the failed potential

transaction proposed by GHP, to compete with TargetSmart and to attempt to take clients away from TargetSmart.

81.     TargetSmart has suffered irreparable harm by GHP and Catalist's actions, including but not limited to reputational damage, lost business opportunities, and lost profits.

**COUNT I**
**Misappropriation of Trade Secrets**
**Under The Federal Defend Trade Secrets Act, 18 U.S.C. § 1836**
(Against GHP and Catalist)

82.     TargetSmart repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

83.     Defendants acted collectively and without authorization to misappropriate TargetSmart's confidential and proprietary Information, including but not limited to TargetSmart's financial projections, CIM, and its client lists.  This confidential and proprietary Information constitute trade secrets ("TargetSmart Trade Secrets").

84.     TargetSmart Trade Secrets are confidential, and TargetSmart takes and has taken reasonable measures to protect the confidential nature of TargetSmart Trade Secrets.

85.     TargetSmart Trade Secrets derive economic value from their confidential nature.

86.     TargetSmart Trade Secrets relate to products intended for use in interstate commerce, including products intended to leverage voter data for campaigns and organizations throughout the United States.

87.     As a direct and proximate result of Defendants' misappropriation of TargetSmart Trade Secrets, TargetSmart has been, and will continue to be, irreparably harmed.

88.     As a direct and proximate result of Defendants' misappropriation of TargetSmart Trade Secrets, TargetSmart has suffered, and will continue to incur, monetary damages.

89.     As a direct and proximate result of Defendants' misappropriation of TargetSmart Trade Secrets, Defendants have been unjustly enriched.

90.     Defendants willfully and maliciously misappropriated TargetSmart Trade Secrets.

91.     Based on Defendants' willful and malicious misappropriation of TargetSmart Trade Secrets, TargetSmart is entitled to recover exemplary damages and attorneys' fees under 18 U.S.C. §§ 1836(b)(3)(C), (D).

## COUNT II
**Misappropriation of Trade Secrets In Violation of Massachusetts Common Law**
(Against GHP and Catalist)

92.     TargetSmart repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

93.     Defendants acted collectively and without authorization to misappropriate TargetSmart Trade Secrets.

94.     TargetSmart Trade Secrets are confidential, competitively sensitive, and owned by TargetSmart.  TargetSmart uses and, at all relevant times, has used the Trade Secrets in their business.

95.     TargetSmart Trade Secrets have independent economic value by virtue of not being known to TargetSmart's competitors, including Catalist.

96.     TargetSmart takes, and at all relevant times has taken, measures to protect the confidential nature of TargetSmart Trade Secrets.

97.     Defendants were made aware and knew that use or disclosure of TargetSmart Trade Secrets was prohibited.

98.     On information and belief, Defendants are using and disclosing TargetSmart Trade Secrets for their benefit.  TargetSmart has never consented to such use or disclosure.

99.     As a direct and proximate result of Defendants' misappropriation of TargetSmart Trade Secrets, TargetSmart has suffered and will continue to suffer harm, including actual loss.

## COUNT III
**Misappropriation of Trade Secrets Under M.G.L. c. 93, §§ 42 and 42A**
(Against GHP and Catalist)

100.     TargetSmart repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

101.     Defendants acquired from TargetSmart information, tangible or intangible or electronically kept or stored, that constitutes, represents, evidences or records a secret scientific, technical, merchandising, production, or management information, design, process, procedure, formula, invention or improvement.

102.     This information is used in TargetSmart's business and it has independent economic value by virtue of not being known to TargetSmart's competitors, including Catalist.

103.     TargetSmart takes, and at all relevant times has taken, reasonable steps to preserve the secrecy of this information.

104.     Defendants stole, unlawfully took, carried away, concealed, copied, or otherwise used this information that now belongs to TargetSmart, with the intent to convert that information to Defendants' own use.  This conduct was willful, knowing, and/or in bad faith.

105.     Defendants' conduct violates the Massachusetts Trade Secrets Act, M.G.L. c. 93, §§ 42 and 42A.

106.     As a result of Defendants' conduct, TargetSmart has suffered and will continue to suffer irreparable harm that cannot be adequately addressed at law.  Unless injunctive relief is granted, TargetSmart will be irreparably harmed in a manner not fully compensable by money damages.

## COUNT IV
### Breach of Contract
(Against GHP)

107.    TargetSmart repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

108.    GHP knowingly, and for valid consideration, entered into Mutual NDA with TargetSmart.

109.    Under the terms of the Mutual NDA, TargetSmart provided certain Information and materials to GHP, but retained ownership of, and restricted GHP's use and disclosure of, such materials or Information.  GHP promised to safeguard TargetSmart's confidential and proprietary Information from disclosure while the parties discussed a potential transaction with TargetSmart.

110.    The Mutual NDA is a lawful contract voluntarily and knowingly entered into by GHP.

111.    GHP's use and disclosure of TargetSmart's confidential and proprietary Information covered by the Mutual NDA and belonging to TargetSmart, without TargetSmart's express written consent, is a breach of the Mutual NDA.

112.    GHP's disclosure of the existence of the Mutual NDA and the potential transaction, without obtaining TargetSmart's express written consent, is a breach of the Mutual NDA.

113.    GHP's failure to direct its Representatives not to disclose to any third party (a) the existence or contents of the Mutual NDA, or (b) the fact that GHP was evaluating the information or the possibility of a transaction, is a breach of the Mutual NDA.

114.     GHP's failure and refusal to return TargetSmart's confidential and proprietary Information to TargetSmart upon TargetSmart's express written request is a breach of the Mutual NDA.

115.     GHP's failure and refusal to destroy analyses, compilations, studies, or other documents prepared by GHP or its Representatives based on TargetSmart's confidential Information at TargetSmart's request is a breach of the Mutual NDA.

116.     As a direct and proximate result of GHP's numerous breaches of the Mutual NDA, TargetSmart has suffered, and continues to suffer, irreparable harm.

117.     GHP's conduct in breaching the Mutual NDA was and is willful, intentional, and unprivileged.

**COUNT V**
**Breach of The Covenant of Good Faith and Fair Dealing**
(Against GHP)

118.     TargetSmart repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

119.     TargetSmart and GHP entered into a valid contract, the Mutual NDA, by which each promised to safeguard the other party's confidential and proprietary Information from disclosure while the parties discussed a potential transaction between TargetSmart and GHP's unidentified clients.

120.     GHP knew that it would and could not honor its obligations under the Mutual NDA because GHP had a competing contractual obligation to share information with and advise its client, Catalist, about TargetSmart, Catalist's acquisition target.

121.    GHP failed to act in good faith in entering into the Mutual NDA and performing its obligations thereunder.  In failing to act in good faith, GHP deprived TargetSmart of the benefits under the Mutual NDA, namely, protection of its confidential and proprietary Information to competitors and other parties.

122.    As a direct and proximate result of GHP's breach of the covenant of good faith and fair dealing, TargetSmart has suffered, and continues to suffer irreparable harm and actual loss.

### COUNT VI
### Unjust Enrichment
(Against GHP and Catalist)

123.    TargetSmart repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

124.    As a result of Defendants' misappropriation and use of TargetSmart's confidential and proprietary Information, Defendants received a benefit from TargetSmart, including but not limited to, business opportunities and technical development savings and shortcuts, for which Defendants have not paid and to which they were not entitled.

125.    Defendants have improperly, and without consent from TargetSmart, retained this confidential and proprietary Information and the benefits derived therefrom, to which they are not entitled.

126.    On information and belief, Defendants have used and continue to use this ill-gotten Information, and opportunities derived therefrom, for their own benefit.

127.    The taking and retention of these benefits is both inequitable and unjust.

128.    As a direct and proximate result of Defendants' unjust enrichment, TargetSmart has suffered substantial actual harm.

129.     Defendants' actions have been willful and outrageous and undertaken with intentional or reckless indifference to TargetSmart's rights.

**COUNT VII**
**Fraudulent Misrepresentation**
(Against GHP)

130.     TargetSmart repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

131.     GHP, as agent of Catalist, made false representations to TargetSmart concerning the identity of its client and the nature of the potential transaction.

132.     GHP's false statements materially induced TargetSmart to enter into the Mutual NDA and disclose its confidential and proprietary Information.

133.     If GHP had not made these misrepresentations, TargetSmart would not have entered into the Mutual NDA, nor would it have disclosed its confidential and proprietary Information to GHP.

134.     GHP wrongfully obtained TargetSmart's confidential and proprietary Information as a result of GHP's misrepresentations.

135.     As a direct and proximate result of GHP's fraudulent misrepresentations, TargetSmart has suffered substantial harm, including but not limited to loss of commercial opportunities and actual loss.

**COUNT VIII**
**Violation of the Massachusetts Unfair and Deceptive Practices Act**
**M.G.L. c. 93A, §§ 2 and 11**
(Against GHP and Catalist)

136.     TargetSmart repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

137.     TargetSmart is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c. 93A, § 1.

138.     The conduct constituting violations of M.G.L. c. 93A occurred primarily and substantially in Massachusetts.

139.     Defendants' actions, as set forth above, constitute unfair and deceptive trade practices within the meaning of M.G.L. c. 93A, § 2.

140.     Defendants' actions, as set forth above, constitute willful and knowing violations of M.G.L.c. 93A, §§ 2 and 11.

141.     As a result of the Defendants' violations of M.G.L. c. 93A, §§ 2 and 11, TargetSmart has suffered monetary damages and substantial and irreparable injury, and is threatened with further substantial and irreparable harm that monetary relief alone cannot adequately remedy.

## COUNT IX
### Defamation
(against Catalist)

142.     TargetSmart repeats and incorporates by reference each of the foregoing paragraphs of its Complaint.

143.     Catalist, by and through its executives or employees, made defamatory statements of fact.

144.     The defamatory statements by Catalist concerned TargetSmart and TargetSmart's business.

145.     Catalist's defamatory statements were published by being repeated by email or verbally to one or more third persons.

146.     The defamatory statements, including without limitation that TargetSmart was "for sale," were false.

147. As a result of Catalist's defamatory statements, TargetSmart has suffered damages including without limitation the costs it incurred to preserve and defend its reputation in the marketplace.

## JURY DEMAND

TargetSmart demands a trial by jury as to all claims that may be tried by a jury.

## PRAYERS FOR RELIEF

WHEREFORE, TargetSmart prays for judgment in its favor and against Defendants as follows:

1. A permanent injunction against Defendants prohibiting them from using or disclosing for any purpose (including but not limited to for development of investors, for regulatory purposes, or for business development and promotion) TargetSmart's confidential and proprietary Information;

2. An order requiring Defendants to provide an accounting for any projects, plans, services, contracts or other customer material, that involve or rely on any TargetSmart information or trade secret information, and for any business obtained by Defendants as a consequence of their unlawful actions, and assigns to TargetSmart all plans, services, and contacts so obtained;

3. An order requiring Defendants to account for all TargetSmart Information and TargetSmart Trade Secrets in their possession, custody, or control, and to certify that they have returned to TargetSmart all TargetSmart Trade Secrets in their possession, custody, or control;

4. An order requiring Defendants to provide to TargetSmart a list of individuals who received TargetSmart Information and a declaration from this Court, to be served on those individuals, that such information must be returned to TargetSmart;

5.     An order permitting TargetSmart to select a computer forensic expert to examine all devices capable of storing or transmitting electronic data in Defendants' possession, custody, or control to confirm that Defendants no longer possess any TargetSmart confidential property, or trade secret information, and to create a list of all transmissions or physical deliveries of any TargetSmart information to any recipient.

6.     Monetary damages in excess of $75,000;

7.     Treble damages as permitted by law;

8.     Incidental and consequential damages as permitted by law;

9.     Punitive damages;

10.    Attorneys' fees and costs as permitted by law;

11.    Such other relief as the Court deems appropriate.


Dated: December 13, 2018             */s/ Gregory S. Bombard*
                                              Michael R. Gottfried (BBO# 542156)
                                              Gregory S. Bombard (BBO# 679720)
                                              Lauren A. Appel (BBO# 689084)
                                              Bryan D. Harrison (BBO #696596)
                                              **Duane Morris LLP**
                                              100 High Street, Suite 2400
                                              Boston, MA 02110-1724
                                              (857) 488-4200
                                              mrgottfried@duanemorris.com
                                              gbombard@duanemorris.com
                                              LAAppel@duanemorris.com
                                              bharrison@duanemorris.com

                                              *Attorneys for TargetSmart Holdings, LLC and*
                                              *TargetSmart Communications, LLC*

## <u>CERTIFICATE OF SERVICE</u>

This document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent out to those indicated as non-registered participants on December 13, 2018.

/s/ Bryan Harrison
Bryan Harrison

DM1\9117000.2